**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KWASNY COMPANY,

Plaintiff,

Case No. 09-13357
Hon. Gerald E. Rosen

v.

ACRYLICON INTERNATIONAL LTD.,

Defendant.
_________________________________/

**OPINION AND ORDER REGARDING PLAINTIFF'S**
**MOTION TO DISMISS BASED ON ARBITRATION PROVISION**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on June 11, 2010

PRESENT: Honorable Gerald E. Rosen
Chief Judge, United States District Court

## I. INTRODUCTION

Plaintiff Kwasny Company commenced this suit in this Court on August 25, 2009, seeking a declaration that it does not owe Defendant AcryliCon International Ltd. under invoices issued by Defendant to Plaintiff in December of 2007. According to Plaintiff's complaint, Defendant issued substantially the same invoices to another entity, Industrial Flooring Solutions, Inc., in the summer of 2006, and reissued these invoices to Plaintiff only after it was unable to collect from this third party. In addition to answering the complaint, Defendant has filed a number of counterclaims, supported principally by allegations that the invoices it issued to Plaintiff arose under an exclusive license

agreement executed by the parties in January of 2007. Accordingly, in its counterclaims, Defendant seeks payment on these invoices, and also asserts that Plaintiff has breached other obligations allegedly owed under the exclusive license agreement. The Court's subject matter jurisdiction over both Plaintiff's claim and Defendant's counterclaims rests upon diversity of citizenship, with Plaintiff a Michigan corporation and Defendant a corporation organized under the laws of the United Kingdom with its principal place of business in Norway. *See* 28 U.S.C. § 1332(a)(2).

By motion filed on October 6, 2009, Plaintiff seeks the dismissal of three of Defendant's counterclaims as subject to a binding arbitration agreement. Specifically, the exclusive license agreement entered into by the parties in January of 2007 includes an arbitration clause requiring that "[a]ny controversy or claim arising out of or relating to this Agreement . . . shall be finally settled by arbitration." (Complaint, Ex. A, Exclusive License Agreement at ¶ 16.15.) In Plaintiff's view, this clause dictates that the three counterclaims resting upon alleged breaches of this agreement must be arbitrated. In response, Defendant argues that Plaintiff has waived its right to arbitration by commencing this suit and invoking the jurisdiction of this Court to resolve the parties' disputes. Defendant further contends that Plaintiff's demand for arbitration is defeated by Defendant's plea for injunctive relief, and by a mutual mistake in a purportedly material term of the agreement's arbitration clause.

Plaintiff's motion has been fully briefed by the parties. Having reviewed the parties' written submissions in support of and opposition to this motion, as well as the

remainder of the record, the Court finds that the pertinent facts, allegations, and legal issues are sufficiently presented in these materials, and that oral argument would not assist in the resolution of this motion. Accordingly, the Court will decide Plaintiff's motion "on the briefs." *See* Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings on this motion.

## II. FACTUAL BACKGROUND

For present purposes, the pertinent factual background of this case is quite straightforward, and rests exclusively on the allegations of Plaintiff's complaint and Defendant's counter-complaint. Plaintiff Kwasny Company is a Michigan corporation that installs industrial flooring and lining systems. Defendant AcryliCon International Ltd. is a corporation organized under the laws of the United Kingdom that markets and sells industrial flooring systems.

On January 24, 2007, the parties entered into an Exclusive License Agreement (the "Agreement"), under which Plaintiff agreed to pay certain amounts to Defendant in exchange for the right to use certain of Defendant's products. (Complaint, Ex. A.) The Agreement includes an arbitration clause, which provides in pertinent part:

> Any controversy or claim arising out of or relating to this Agreement, including any controversy or claim relating to the validity, interpretation or performance of this Agreement, shall be finally settled by arbitration in accordance with the rules of the Conciliation and Arbitration of the International Chamber of Commerce, as then in effect. The appointing and administrating body will be the English Centre for International Commercial Arbitration. All arbitral proceedings conducted pursuant to this provision shall be in strict accordance with the following conditions:

> (a) All arbitral proceedings shall be conducted in the State of Michigan, in the United States if the proceeding is initiated by [Defendant], and in London, United Kingdom if the proceeding is initiated by [Plaintiff], and in each case under the substantive law applying in the country, county, or state where the actual dispute or breach of this Agreement occurred.
>
> * * * *
>
> (c) All arbitral proceedings hereunder shall be conducted before a panel of three arbitrators. [Defendant] and [Plaintiff] shall each appoint one member to the arbitral panel within 30 days after receipt of notice that arbitration will be conducted pursuant hereto. The third member of the arbitral panel shall be appointed by the two members originally appointed within 30 days after their appointment. If an appointment to the arbitral panel is not made within the time periods set forth herein, such appointment shall be made in accordance with the rules of the Conciliation and Arbitration of the International Chamber of Commerce currently in effect.
>
> * * * *
>
> Nothing in this Clause 16.15 shall restrict either party from pursuing injunctive relief where appropriate in any court of competent jurisdiction.

(*Id.* at ¶ 16.15.)

In December of 2007, Defendant sent invoices to Plaintiff totaling $196,216.52 for materials and services allegedly provided by Defendant to Plaintiff. (*See* Complaint, Ex. B.) According to Plaintiff's complaint, however, these invoices actually stemmed from services rendered by Defendant on behalf of a third party, Industrial Flooring Solutions, Inc. Plaintiff further alleges that Defendant issued substantially the same invoices to Industrial Flooring between June and August of 2006, and that these invoices were altered and reissued to Plaintiff "[o]nly after [Defendant] was unable to collect from Industrial

Flooring." (Complaint at ¶ 15.) In Plaintiff's view, Defendant took this course of action in an attempt to bring the Industrial Flooring invoices within the ambit of the parties' Agreement and its arbitration provision, when in fact these invoices "are not related to the Agreement and do not serve as a basis to invoke the arbitration clause of the Agreement." (*Id.* at ¶¶ 15, 20.) Accordingly, in its complaint, Plaintiff seeks a declaration that the invoices "are not related to the Agreement and do not serve as a basis to invoke the arbitration clause of the Agreement," (*id.* at 20), as well as a declaration that it does not owe any amount to Defendant under these invoices.

Not surprisingly, Defendant's counter-complaint rests upon a significantly different set of allegations. According to Defendant, the invoices at issue reflect materials received by Plaintiff from Defendant, and Plaintiff therefore was obligated under the Agreement to pay the invoiced amounts within 30 days. (*See* Counter-Complaint at ¶¶ 7, 11.) Defendant further alleges that Plaintiff breached other terms of the Agreement, including a non-compete provision and a minimum purchase requirement. Based on these allegations, Defendant has asserted six counterclaims against Plaintiff, three of which expressly rest upon purported breaches of the Agreement, and the remainder of which assert alternative legal theories for recovery of the $196,216.52 that is allegedly due and owing under the invoices issued to Plaintiff in December of 2007.

## III. ANALYSIS

### A. The Standards Governing Plaintiff's Motion

Through the present motion, Plaintiff seeks the dismissal of three of the six claims

asserted in Defendant's counter-complaint, on the ground that these claims are subject to arbitration under the terms of the Exclusive License Agreement entered into by the parties. Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, an arbitration clause in a commercial contract — such as the arbitration provision found in the parties' Agreement here — "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In addition, the FAA authorizes "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" to petition a federal district court "for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

Thus, the threshold question before the Court is whether the arbitration clause in the parties' Agreement calls for Defendant's counterclaims to be resolved through arbitration. *See Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). The Sixth Circuit has identified four components to this inquiry:

> When considering a motion to stay proceedings and compel arbitration under the [FAA], a court has four tasks: first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Stout*, 228 F.3d at 714. In determining the existence and scope of an agreement to

arbitrate, the Court is guided by ordinary contract law principles,[1] but "any doubts regarding arbitrability should be resolved in favor of arbitration." *Fazio v. Lehman Brothers, Inc.,* 340 F.3d 386, 392-93 (6th Cir. 2003).

**B. Defendant's Counterclaims Based on Alleged Breaches of the Parties' Agreement Are Clearly Subject to Arbitration Under the Agreement's Arbitration Clause, and This Obligation To Arbitrate Is Not Overcome by Waiver, Mutual Mistake, or Defendant's Plea for Injunctive Relief.**

Counts One, Two, and Three of Defendant's counter-complaint expressly rest upon alleged breaches of obligations owed by Plaintiff under the terms of the parties' Agreement. In Plaintiff's view, these claims fall squarely within the scope of the arbitration clause of the Agreement, which broadly mandates arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement, including any controversy or claim relating to the validity, interpretation or performance of this Agreement." (Agreement at ¶ 16.15.) Defendant, in turn, does not dispute that this arbitration provision, read in isolation, would compel the arbitration of its claims that Plaintiff has failed to perform under the Agreement and has breached certain of its terms. Nonetheless, in opposing Plaintiff's demand for arbitration of these claims, Defendant

---

[1]Under the parties' Agreement, the arbitration clause and the other provisions of the Agreement are to be construed "in accordance with English Law." (Agreement at ¶ 16.6.) As will become clear, however, the interpretative task before the Court is entirely straightforward and does not turn upon any possible idiosyncracies of English contract law. Indeed, Defendant has cited only a single English decision in its submission to the Court, in order to establish the "ancient canon of contract law" that "agreements may be voided on mutual mistake by the parties." (Defendant's Response Br. at 10.) Defendant then goes on to recite the three-part test for mutual mistake set forth in the Restatement (Second) of Contracts. Evidently, then, Defendant does not believe it necessary to make the Court aware of any unique features of English law in order to resolve its claim of mutual mistake.

advances three reasons why, in its view, the Agreement's arbitration clause should not be enforced under the circumstances of this case: (i) Plaintiff's purported waiver of its contractual right to arbitrate by commencing this litigation; (ii) the parties' mutual mistake in identifying a non-existent organization to oversee the arbitration process; and (iii) Defendant's exercise of its contractual right to pursue injunctive relief before this Court. As discussed below, the Court finds that none of the challenges advanced by Defendant provides a basis for declining to hold the parties to their clearly stated, mutual promise to arbitrate any disputes arising from their Agreement.

In seeking to avoid the resolution of its counterclaims through arbitration, Defendant first contends that Plaintiff has waived its right to invoke the arbitration clause of the parties' Agreement by eschewing the arbitration of its own claims, and instead electing to pursue these claims before this Court. As Defendant correctly observes, "[a]n agreement to arbitrate may be waived by the actions of a party which are completely inconsistent with any reliance thereon." *General Star National Insurance Co. v. Administratia Asigurarilor de Stat*, 289 F.3d 434, 438 (6th Cir. 2002) (internal quotation marks and citation omitted). One such action that the courts have deemed inconsistent with reliance on a contractual agreement to arbitrate is a party's "election to proceed before a nonarbitral tribunal for the resolution of a contractual dispute." *Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 390 (7th Cir. 1995). Such a course of action "manifest[s] an intention to resolve the dispute through the processes of the federal court," and thus is deemed a "presumptive waiver of the right to arbitrate."

*Cabinetree,* 50 F.3d at 390. In Defendant's view, this sort of presumptive waiver occurred here when Plaintiff commenced this litigation, seeking judicial declarations (i) that the invoices issued by Defendant in December of 2007 do not rest upon any obligations arising under the parties' January 24, 2007 Agreement, and (ii) that Plaintiff does not owe any amount under these invoices.

Yet, in order to view this litigation as Plaintiff's "election to proceed before a nonarbitral tribunal for the resolution of a contractual dispute," *Cabinetree,* 50 F.3d at 390, the Court would have to conclude as a threshold matter that Plaintiff's complaint calls for the judicial resolution of a "contractual dispute." Such a conclusion, however, would be manifestly contrary to the express allegations of Plaintiff's complaint: namely, that the invoices at issue do not arise from or relate to the parties' Agreement, but instead reflect a debt that is owed by an altogether separate entity, Industrial Flooring Solutions, and that pre-dates the existence of the parties' Agreement. (*See* Complaint at ¶¶ 13-17.) Accepting these allegations as true — as the Court must at the present stage of this litigation, before the parties have conducted any significant discovery, and without Defendant having even suggested any evidentiary basis for the Court to reject these allegations — Plaintiff's complaint does not call for the judicial resolution of any "contractual dispute" that might be subject to the Agreement's arbitration clause. Rather, Plaintiff has brought before the Court a dispute which, according to the complaint, is wholly separate from (and antecedent to) the Agreement and its arbitration provision. Because Plaintiff had no contractual right to demand arbitration of this dispute, it cannot

have waived any such right by electing to resolve this dispute in a judicial forum.

Next, Defendant seeks to defeat the enforcement of the Agreement's arbitration clause by citing a "mutual mistake" in this provision: namely, the identification of a non-existent entity, the "English Centre for International Commercial Arbitration," as the "appointing and administrating body" for any arbitration conducted under the Agreement's arbitration clause. (Agreement at ¶ 16.15.) Because this entity evidently does not exist, and because the parties shared a mistaken belief on this point, Defendant contends that the parties "fail[ed] to reach a meeting of the minds on a material aspect of the parties' arbitration clause," and that their arbitration agreement therefore "is void and unenforceable." (Defendant's Response Br. at 11.)

As Defendant recognizes, a mutual mistake voids a contractual provision only if mistake is material — that is, if "the mistaken belief relates to a basic assumption of the parties upon which the contract is made, and which materially affects the agreed performances of the parties." *Bratt Enterprises, Inc. v. Noble International, Ltd.,* No. 05-3701, 182 F. App'x 435, 437 (6th Cir. May 12, 2006) (internal quotation marks and citation omitted). In the specific context of mistakes in arbitration clauses, the courts have framed the pertinent inquiry as whether the parties' overarching intent to arbitrate a dispute, as evidenced by the language of their arbitration agreement and any relevant surrounding circumstances, survives and is severable from a particular infirmity or ambiguity within this agreement. *See, e.g., Great Earth Companies, Inc. v. Simons,* 288 F.3d 878, 890 (6th Cir. 2002); *National Iranian Oil Co. v. Ashland Oil, Inc.,* 817 F.2d

326, 333 (5th Cir. 1987). Applying this principle, the courts have enforced arbitration agreements despite (i) an illegal forum selection clause within the arbitration agreement, *Great Earth Companies*, 288 F.3d at 890-92; (ii) references in the parties' agreement to arbitration procedures that were "no longer in existence" and thus "no longer workable," *Chattanooga Mailers Union, Local No. 92 v. Chattanooga News-Free Press Co.,* 524 F.2d 1305, 1315 (6th Cir. 1975), *overruled on other grounds as recognized by Bacashihua v. United States Postal Service*, 859 F.2d 402, 404 (6th Cir. 1988); (iii) a forum selection clause stating that the arbitration was to be held either in Peking, China, or in a second location that was left blank in the parties' agreement, *Bauhinia Corp. v. China National Machinery & Equipment Import & Export Corp.,* 819 F.2d 247, 249-50 (9th Cir. 1987); (iv) an arbitration clause that failed to specify which of nearly 200 arbitration commissions in China was to conduct the parties' arbitration, *Apple & Eve, LLC v. Yantai North Andre Juice Co.,* 499 F. Supp.2d 245, 250-53 (E.D.N.Y. 2007); (v) contract language in which the parties agreed to submit their disputes to "the International Arbitration in the Hague," a non-existent entity, *Rosgoscirc v. Circus Show Corp.,* No. 92-Civ-8498, 1993 WL 277333, at *3, *5-*6 (S.D.N.Y. July 16, 1993); (vi) an arbitration clause that failed to specify "the method for choosing arbitrators, the governing arbitration association, or the governing laws for the arbitration," *Euro-Mec Import, Inc. v. Pantrem & C., S.p.A.,* No. 92-2624, 1992 WL 350211, at *4-*5 (E.D. Pa. Nov. 16, 1992); and (vii) the parties' adoption of arbitration rules that conferred a role upon the Michigan courts in violation of a Michigan statute and court rule governing the arbitration

process, *Brucker v. McKinlay Transport, Inc.*, 454 Mich. 8, 557 N.W.2d 536, 540-41 (1997).

In this case, Defendant has failed to identify any basis for the Court to conclude that the parties' mistaken reference to a non-existent arbitration body in their Agreement should be viewed as integral to, and not severable from, the parties' expressly stated intent to arbitrate "[a]ny controversy or claim arising out of or relating to" the Agreement. This arbitration clause is quite broad, reflecting the parties' shared intent to arbitrate any dispute "relating to" the Agreement, and it specifies a number of details about how this arbitration is to be conducted, including the rules governing the arbitration process, the forum for the arbitration proceedings, and the method for selecting arbitrators. Indeed, the clause itself mitigates, to a significant extent, the parties' mistaken reference to a non-existent administrative entity, by virtue of the parties' stipulation to arbitrate in accordance with the International Chamber of Commerce ("ICC") Rules of Arbitration. (Agreement at ¶ 16.15.) These rules, in turn, expressly identify the International Court of Arbitration as "the arbitration body attached to the ICC" that is responsible for administering the ICC rules, ICC Rules of Arbitration, art. I, ¶¶ 1-2, *available at* http://www.iccwbo.org/uploadedFiles/Court/Arbitration/other/rules_arb_english.pdf, thereby suggesting the identity of the agency the parties might have had in mind with their mistaken reference to the "English Centre for International Commercial

Arbitration."[2]

More generally, the Agreement makes it clear that any infirmity in one of its provisions does not provide a basis for invalidating its remaining terms. The Agreement states that any provision that is determined to be "invalid or unenforceable as written . . . shall be deemed to be modified to such extent [and] in such manner as necessary for such provision[] to be valid and enforceable to the greatest extent possible." (Agreement at ¶ 16.4.) If a provision remains invalid or unenforceable despite this attempted reformation, "the remainder of this Agreement . . . shall be unaffected thereby and each term or provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law," with the parties under a duty to "consult in good faith to agree upon an amendment to this Agreement which shall, so far as possible, re-establish the commercial and legal effect of the severed provision." (*Id.* at ¶ 16.5.) The Sixth Circuit has construed similar language as "evinc[ing] a clear intention that the failure of a distinct part of [an arbitration clause] . . . should not infect other parts of the arbitration provision." *Great Earth Companies,* 288 F.3d at 891.

Turning to the extrinsic evidence, the parties' conduct after their dispute arose does not suggest that their mistaken belief in the existence of the "English Centre for International Commercial Arbitration" was material to their willingness to arbitrate

[2]In fact, in the e-mail correspondence through which Defendant's counsel learned that this institution did not exist, he was advised that the ICC "does have a centre in London" that might be able to process the parties' request for arbitration under the ICC rules. (Defendant's Response, Ex. A.)

disputes arising from their Agreement. As an exhibit to its response brief, Defendant has provided e-mail correspondence indicating that its counsel learned of this mistake on or around June 4, 2009. (*See* Defendant's Response, Ex. A.) Yet, later that month, on June 24, 2009, Defendant's counsel sent a letter to Plaintiff invoking the Agreement's arbitration clause and demanding arbitration of the parties' dispute, without in any way indicating that the parties' arbitration agreement might be unenforceable due to a mutual mistake in the designation of an arbitral body. (*See* Defendant's Response, Ex. B.) Likewise, both parties have referred in their briefs to ongoing negotiations about the terms and conditions that would govern the arbitration process. (*See* Defendant's Response Br. at 4-5; Plaintiff's Reply Br. at 5.)[3] Throughout the record, then, there is nary a suggestion that either party — whether Defendant, the apparent drafter of the Agreement, or Plaintiff — has ever claimed that its willingness to arbitrate hinged upon the participation of the entity mistakenly referred to in the Agreement as the "English Centre for International Commercial Arbitration." Under these circumstances, the Court readily concludes that this mistaken reference is severable from, and does not render unenforceable, the parties' broad and overarching agreement to arbitrate any disputes arising out of or relating to the Agreement.

As its final challenge to Plaintiff's motion to compel arbitration, Defendant notes

[3]In its reply brief, Plaintiff suggests that the parties have "already agreed that, notwithstanding the language of the arbitration provision, any arbitration would be decided under the rules of the American Arbitration Association in front of Barry Howard." (Plaintiff's Reply Br. at 5.) Unfortunately, Plaintiff has failed to cite any evidentiary support for this statement, and the Court cannot accept as true the bare assertions of counsel in a brief.

that it is expressly permitted under the Agreement's arbitration clause to "pursu[e] injunctive relief where appropriate in any court of competent jurisdiction," (Agreement at ¶ 16.15), and it points to its plea for injunctive relief in Count One of its counter-complaint as an exercise of this contractual authority. It follows, in Defendant's view, that the referral of this counterclaim to an arbitrator will result in piecemeal litigation, with the injunctive aspect of this claim remaining before this Court pursuant to the parties' Agreement. Yet, as Plaintiff points out, the courts generally construe their authority to grant injunctive relief in connection with an arbitrable dispute as limited to such relief as is necessary to avoid "render[ing] the process of arbitration meaningless or a hollow formality." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1380 (6th Cir. 1995); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211, 214-15 (7th Cir. 1993); *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1053-54 (2d Cir. 1990). In this case, Defendant has not moved for a preliminary award of the injunctive relief sought under Count One of its counter-complaint, nor is there otherwise any indication in the record that such relief is necessary to preserve the viability of the parties' chosen method of dispute resolution, the arbitration process. Under these circumstances, the language in the Agreement preserving the parties' opportunity to seek injunctive relief cannot be viewed as overriding the parties' stated intent to arbitrate any disputes arising from the Agreement, but rather as supportive of this agreement to arbitrate.

In any event, Defendant's professed concern with piecemeal litigation ignores the

brute fact that Plaintiff seeks to compel the arbitration of only some, but not all, of Defendant's counterclaims, and that Plaintiff's claims likewise are not subject to arbitration. Consequently, some portions of this litigation will remain in this Court, thereby preserving Defendant's opportunity to seek injunctive relief at an appropriate time and under the proper circumstances. The courts have emphasized that such concerns of piecemeal litigation do not overcome the obligation of contracting parties to arbitrate those disputes within the scope of their arbitration agreement. *See Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 217, 105 S. Ct. 1238, 1241 (1985) (holding that the Federal "Arbitration Act requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums"); *Bratt Enterprises, Inc. v. Noble International Ltd.*, 338 F.3d 609, 613 (6th Cir. 2003) ("Congress's preeminent concern in enacting the FAA — the enforcement of private agreements to arbitrate as entered into by the parties — requires that the parties only be compelled to arbitrate matters within the scope of their agreement, and this is so even when the result may be piecemeal litigation.").

This is not to say, however, that the Court is powerless to ameliorate the potential duplication of efforts and waste of the parties' and judicial resources that might result from the referral of only some of Defendant's counterclaims (and none of Plaintiff's claims) to arbitration. There is an undeniable overlap between the counterclaims that are subject to arbitration and those that will remain before the Court. In particular, if

Defendant prevails in arbitration on its claim that Plaintiff breached the parties' Agreement by failing to pay the amounts set forth in the December 2007 invoices, this presumably would provide all of the relief sought under the three counterclaims that remain pending before the Court. Likewise, such an arbitral ruling in Defendant's favor would entail the rejection of Plaintiff's sole claim before this Court, which rests upon allegations that the December 2007 invoices do not arise from any products or services provided under the Agreement.

Under these circumstances, the Court is inclined to stay any further proceedings in this case until the arbitration has concluded. The Sixth Circuit has identified this question "whether to stay the remainder of the proceedings pending arbitration" as the fourth and final step in a court's consideration of a motion to compel arbitration. *Stout*, 228 F.3d at 714. Because Plaintiff has affirmatively moved for an order compelling arbitration of certain of Defendant's counterclaims, it seems only fair to stay any further proceedings on Plaintiff's own claim until the requested arbitration has concluded. Moreover, and as explained above, the arbitrator will likely be presented with the mirror image of the contention advanced in support of Plaintiff's claim — one of Defendant's counterclaims that is subject to arbitration rests upon the premise that the December 2007 invoices arise from the parties' Agreement, while Plaintiff's claim rests upon the denial of this premise. Finally, an arbitration award in Defendant's favor promises to obviate the need for Defendant to seek any further relief under the counterclaims that remain before the Court. Consequently, if either party believes that the Court should not stay all proceedings in this

case pending the completion of arbitration, it must file a written statement in opposition to a stay within ***fourteen (14) days*** of the date of the present opinion.

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's October 6, 2009 motion to dismiss based on a binding arbitration provision (docket #7) is GRANTED. IT IS FURTHER ORDERED that the parties are directed to proceed with the arbitration of Counts One, Two, and Three of Defendant's counter-complaint in accordance with the terms of their Exclusive License Agreement and the rulings in this opinion and order. IT IS FURTHER ORDERED that these three counterclaims are DISMISSED, without prejudice to either party's opportunity to file a motion seeking to confirm, vacate, or modify any eventual arbitration award with respect to these counterclaims, or seeking any other relief to which either party may be entitled with respect to these counterclaims.

Finally, IT IS FURTHER ORDERED that any party opposing a stay of these proceedings pending the completion of the above-ordered arbitration must file and serve a statement of its opposition within ***fourteen (14) days*** of the date of this opinion and order, with this statement setting forth the specific grounds for the party's belief that a stay of

proceedings would be inappropriate.

       SO ORDERED.

                             s/Gerald E. Rosen
                             Chief Judge, United States District Court

Dated: June 11, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 13, 2010, by electronic and/or ordinary mail.

                             s/Ruth A. Gunther
                             Case Manager